UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SANTO RUIZ,
VIRGILIO RUIZ,
     PLAINTIFFS;

V.

UNITED STATES OF AMERICA,
JOHN ASHCROFT, U.S. DEPARTMENT OF JUSTICE
JOHN ASHCROFT, FEDERAL BUREAU OF PRISONS
JOHN ASHCROFT, IMMIGRATION & NAT. SCS.
JOHN SNOW, U.S. TREASURY DEPARTMENT
THOMAS PERRET, BUREAU OF ATF
MITT ROMNEY, STATE OF MASSACHUSETTS
STEPHEN D. COAN, STATE FIRE MARSHALS
THOMAS M. MENINO, CITY OF BOSTON
WILLIAM A. SOMMERS, BOSTON INSPECTION SCS. DEPT.
PAUL F. EVANS, BOSTON POLICE DEPARTMENT
PAUL CHRISTIAN, BOSTON FIRE DEPARTMENT
GALO VASQUEZ, BOSTON ARSON SQUAD
JOHN DOE I, KEYSPAN-BOSTON GAS COMPANY
JOHN DOE II, NSTAR-BOSTON EDISON
RICHARD W. GOODUS, COMMERCE INSURANCE CO.
ROBERT GOLD, HARRY GOLD & SONS, INS.
DAVID MISERANDINO, SAMUEL MCCORMACK CO.
DANIEL CRONIN, PHOENIX INVESTIGATIONS, INC.

03 CV 11334 MLW

FILED
IN CLERKS OFFICE

2003 JUL -9 A 11:17

U.S. DISTRICT COURT
DISTRICT OF MASS.

No. _____

JAMES L. COLLINS, EAST COAST INVESTIGATIONS )
BETTY CLARK, ST. PAUL FIRE & MARINE INS. CO. )
SYLVIA HAMILTON, LANDLORD )
JOHN GREENAWAY, Greenaway Reconstruction, Co. )
JOHN DOHERTY, DOHERTY
MATTHEW FEINBERG & MATTHEW KAMHOLTZ, et al.
    DEFENDANTS

                    JURY TRIAL DEMANDED

# COMPLAINT

## 03 CV 11334 MLW  MAGISTRATE JUDGE Cohen

This is a federal law suit pursuant
to the statute of federal Claims - BIVENS, ETC.,
for compensatory and punitive damages against
the individual and official capacity of the named
defendants, due to their deliberate actions and
inactions that caused false investigation and
false arrest, malicious prosecution and wrong
conviction, wrong punishment and collateral
consequences, suffered by Plaintiffs, Subse-
quent to the fire that partially destroyed the
building at 1951-1955 Columbus Avenue, Rox-
bury, MA, on December 16, 1990.
   As presented below, respectively, defendants
met, conferred, combined and conspired with
each other, orchestrating a collusion that resulted
in emotional, physical and economical damages-
gains and sufferings in violation of Plaintiffs'

-2-

civil rights.

From a day or days, not known, but subsequent to the fire, as demonstrated below, defendants chained in a pursuit that prevented plaintiffs' freedom or caused the loss of it and irreparable and permanent prejudice to them and their families.

According to the facts presented below, but not limited to, even presuming that the official defendants were acting under color of law, and thus, they would be immuned, they are NOT. See BIVENS V. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388, 91 S. CT. 1999, 29 L. Ed 2d 619 (1971); 42 U.S.C. §1983; ETC.

## PARTIES

1) Plaintiff Santo Ruiz ("SANTO"), is a resident at 9 Starr King Ct. Apt. 950, Charlestown, MA 02129; and Citizen of the Dominican Republic.

2) Plaintiff Virgilio Ruiz ("VIRGILIO"), is a resident at Plymouth Correctional Facility ("PCCF"), 26 Long Pond Road, Plymouth, MA 02360; and a Citizen of the Dominican Republic.

3) The Secretary of the U.S. Treasury Department, defendant John Snow ("SNOW"), through the Bureau of Alcohol, Tobacco and

-3-

Firearms ("ATF")- Agent Thomas Perret, is
at 1500 PENNSYLVANIA AVE. N. W., Washington,
D.C. 20226 or ATF, at 650 MASSACHUSETTS AVE.
N. W., Washington, DC 20226; and
     The U.S. Attorney General, defendant John
Ashcroft ("Ashcroft"), through the U.S. De-
partment of Justice, and its branches, i.e.,
the Federal Bureau of Prisons ("BOP") and
Immigration and Naturalization Service, altoge-
ther make the U.S. of America a defendant,
at 950 PENNSYLVANIA AVE., N. W., ROOM 4545,
Washington, DC 20530-0001.
     4) The rest of the named defendants are
residents of Massachusetts and Citizens, as well,
of the U.S. of America, with business addresses
as follows:
     The State of Massachusetts or its governor
Mitt Romney ("Romney") is a defendant
through the State Fire Marshals, i.e.,
Stephen D. Coan ("COAN"), at Executive of
Public Safety, State Rd., P.O. Box 1025,
STOW, MA 01775 or at Governor's office
360 State House, Room 360, Boston, MA 02133.
     5) The City of Boston or its Mayor Thomas
M. MENINO ("MENINO") is a defendant
through the following governmental depart-
ments; at BOSTON CITY HALL, ONE CITY HALL
-4-

SQ., BOSTON, MA 02201

BOSTON INSPECTION SERVICES DEPARTMENT, ("INSPECTION"), or its executive William A. SOMMERS, at 1010 Massachusetts Avenue, BOSTON, MA 02101;

BOSTON POLICE Department ("BPD"), or its Commissioner Paul F. Evans, at 154 Berkeley St., Boston, MA 02116;

Boston Fire Department ("BFD"), or its Commissioner Paul Christian, at 420 Massachusetts Avenue, Boston, MA 02201;

Boston Arson Squad ("SQUAD"), or its executive, Gabo Vosquez ("or John Doe III"), at 920 MASSACHUSETTS AVE., BOSTON, MA 02201;

6) KEYSPAN- "Boston-Gas" Co. or JOHN DOE I is a defendant through itself at

7) NSTAR- "Boston Edison" Co. or JOHN DOE II is a defendant through itself at 800 Boylston Street, Boston, MA

8) "COMMERCE" INSURANCE company or its representative Richard W. Goodes, is a defendant through itself at 11 GORE RD., WEBSTER, MA 01570;

9) HARRY "GOLD & SONS", INS. Agency or its representative Robert Gold, is a defendant through itself at

10) SAMUEL McCORMACK company ("Adjuster")

or its representative, is a defendant through Donid Miserondino ("MISERANDINO"), at 222 FORBES RD, BRAINTREE, MA 02188;

11) "Phoenix Investigations", Inc., or its representative, is a defendant through Daniel Cronin, at

12) "East Coast" Investigations, or its representative, is a defendant through James L. Collins, and/or Tony Pagon, at 436 Southbridge St., Auburn, MA

13) St. Paul Fire & Marine Insurance Company or its representative, is a defendant through itself, at

14) MRS. Sylvia Hamilton or her representative, is a defendant through herself, at 1955 Columbus Ave., APT.#1, Roxbury, MA 02119;

15) Greenaway Reconstruction, co. or its representative, is a defendant through John Greenaway, at 1955 Columbus Ave., APT.#1, Roxbury, MA 02119.

16) MR. John "Doherty", or its representative is a defendant through himself at 12 Bartlett St., Andover, MA 01810;

17) Feinberg & Kamholtz, or its representative is a defendant through MR. Matthew "Feinberg" and MR. Matthew "Kamholtz", at 125 Summer St., Boston, MA 02110.

-6-

## JURISDICTION

18) This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332; 28 U.S.C. § 1491(a)(1); ETC.

## DEFENDANTS RESPONSIBILITIES

A) The defendants, knowingly, willfully and deliberately colluted with each other and caused to divert the investigations and subsequent proceedings, as represented below, but not limited to:

19) On or about August 2, 1993, defendants Doherty, Feinberg and Kamholtz were appointed by the court as legal counsel, which rendered an amazingly ineffective assistance to plaintiffs, throughout Pre-trial, trial, and post-trial proceedings.

20) From a time not known, but at least during the year of 1990, defendant Greenaway failed through his constructing firm, to over-see and effect the general maintainance, to wit, structure repairs, utilities, security after the fire, etc., to the building he was in charge of, at 1951-1955 Columbus Ave., Roxbury, MA.

21) During her ownership, and specifically during 1990, defendant Hamilton, knew or should have known and prevent all the pro-blems and the quality of maintainance applied

to her building at 1951-1955 Columbus Ave.
Roxbury, MA, by her assigned-defendant Green-
oway.

22) Subsequent to the fire, and until
succeeding in their scheme, defendant
St. Paul Fire & Marine Ins. Co., through
Betty Clark and Carl Westermon, used Vir-
gilio's Worker Compensation for which they
were carrying the insurance; and with the
belief that this could cause damage to him,
incited Suspicious, by sharing it in this
perspective with the investigators of the
fire incident.

23) Subsequent to the fire, and until
succeeding in their scheme, defendant East
Coast Investigations firm, through James
L. Collins and Tony Pagon, used Virgilio's
Worker Compensation for which they were
conducting an investigation on behalf of the
above defendant, in subparagraph 22; and with
the belief that this could cause damage to him,
incited Suspicious, by sharing said matter in
this perspective with the investigators of the
fire incident.

24) Subsequent to the fire and until
succeeding in their scheme, defendant Phoe-
nix Investigations, Inc., through Daniel

Cronin and co-worker, private investigator, Kevin Ord, acting on behalf of the insurance that did not want to pay Sonto' store, i.e., Commerce Ins., diverted or caused to divert the result of the investigation of said fire, by alteration of the facts with their speculative observation and evaluation of the site, 19 day after said fire, and thus, evaded the real facts of the cause of this.

25) Subsequent to the fire and until succeeding in their scheme, defendant Samuel McCormack Company, through adjuster, David Miscrandino, acting on behalf of Commerce Ins. Co., diverted or caused to divert the result of the investigation of said fire, by setting up at least two malicious encounters with their client investigator and Sonto, whose even his interpreter, Beth Mahoney, was employed by them, and thus, manipulated said interrogations in a suspicious atmosphere and skeptical behavior.

26) Subsequent to the fire and until succeeding in their scheme, defendant Harry Gold & Sons, Ins. Agency, through its agent, Robert Gold, and its carrier, Commerce Ins. Co., by planned inferences, in order to exclude the insurance coverage for the

store as well as Virgilio's injuries; diverted or caused to divert the result of the investigation and the incident of said fire.

27) Subsequent to the fire and until succeeding in their scheme, defendant commerce insurance company, through its commissioner, Daniel Leria, and agent Robert Gold, (Subparagraph 26, by planned inference, in order to deny the payment for the insurance coverage of the store, as well as Virgilio's injuries; diverted and/or caused to divert the result of the investigation and the incident of the fire.

28) Subsequent to the fire, and until succeeding in their scheme, defendant Nstar-Boston Edison, upon denial to plaintiffs requests in their investigation, of their electricity records-employed in the electrical equipments at the store (i.e., the about six electrical base heaters, fluorescent lights, etc.), and thus, they diverted and/or caused to divert the result of the investigation and subsequent proceedings.

29) Subsequent to the fire, and until succeeding in their scheme, defendant Keyspan-Boston Gas Company, diverted and caused to divert the result of the investigation and subsequent proceedings, by withholding their records of gas leaks services and deliberate

indifference to fix them or suspend the servi-
ces until then; thus, committing perjury through
witness John "Jack" Keefe; and ultimately, de-
nying plaintiffs access to their records co-
rroborated through a third party (i.e., BPD's
report of gas leaks and temporarily repair).

30) Preceding the fire, subsequently, and
until succeeding in their scheme, defendants-
City of Boston, through Thomas M. Menino (mayor),
and his departments commissioners; to wit, Boston
Inspection Services Department; Boston Police Department;
Boston Fire Department; and Boston Arson Squad;
diverted or caused to divert the result of the inves-
tigation of said fire, subsequently to their failure
to inspect and prevent it; and by withholding ex-
culpatory evidence; and by misrepresentation with
the vendetta to prejudice plaintiffs deliberately,
i.e., inspectors; police officers (i.e., withholding
the briefcase, false alarms reports, gas leaks reports,
etc.); firefighters, and Squad investigators (i.e.,
Roy Burie, Gab Vazquez, Joseph Murphy, etc.).

31) Defendant, the State of Massachusetts
or its representative, governor Mitt Romney,
through the state Fire Marshals caused pre-
judice to plaintiffs, by failing to prepare local
fire inspectors for their duties and have a
proper inspection of the site that could have

-11-

prevented the fire.

32) Subsequent to the fire and throughout the sequence of proceedings, i.e., investigation, federalization, prosecution and punishment of plaintiffs; the U.S. of America become a defendant through its branches, to wit, the U.S. Treasury Department or Secretary John Snow, through its subbranch, the Bureau-"ATF", i.e., agent Thomas Perret; and

the U.S. Department of Justice or attorney General John Ashcroft, through then, attorney Donald Sturn and his assistants, Kevin C Lawherty, John Griffin, etc.; and through appointed ineffective counsel, i.e., then, Messrs. Doherty, Feinberg and Komholtz; through Probation officer, Thomas Griffin;

All who met, conferred and combined with each other and witnesses with false testimonies, and pretenses, under the umbrella of the local, state and federal authorities, to wit, but not limited to, the following law enforcement: (1) Boston Inspection, Police, Arson Squad, and Fire Department; (2) Massachusetts Fire Marshals, etc.; and

Build up a false case against plaintiffs that for the same reason, ended up in false arrest, malicious prosecution, wrongly convictions, and punishment; through the BOP; and

-12-

ultimately, through INS or under the now, Home Security Department or Secretory Tom Ridge, as the ultimate Collateral Consequences, as a result of the preceding matter.

# F A C T S

B) THE DELIBERATE INDIFERENCE for the lack of repairs of the gas leak compromising the following defendants, but not limited to, Keyspan-Boston Gas Company; NSTAR-Boston Edison; Boston Fire Department; Boston Inspection Services Department; Boston Arson Squad; Massachusetts State Fire marshals; MRs. Sylvia Hamilton; ETC.

33) In June, 1988, Virgilio moved from Jomaica Plain to 1953 Columbus Ave., APT#1, Roxbury, to work as a clerk and interpreter, for his brother Rafael "William" Ruiz - Columbus market, which was below the apartment at 1951 Columbus Ave.

34) As William specified in his affidavit, Virgilio's involvement represented among other tasks, the following:

11.- "On or about June - August, 1988, MR. Virgilio Ruiz, helped me, in separated occasions with MRS. Sylvia Hamilton (Building's owner) as well as with MR. Delroy Tucker (Alarm System - Some one as

-13-

in the instant case) and with Bortong or and
Borton Edison Componie, in translating
and interpreting agreement, and matters,
such as the premise lease; the alarm
contract; reporting gas leaks; and so on,
consecutively. And that was the same
favor, that he was doing with Santo's
business transaction, and if he went
further, it was because not only did not
speak English, but because he had not
a proper social security number, as well."

35) While Virgilio was at william's store,
upon his calls due to smell of gas, the gas company
went there to check, as william stated in his affi-
davit:

5.-"Before I moved my food store, I had it
on the very next block, and where I had constant
problems with rats, floods, gas leaks, Ventila-
tion, etc.

6.- While I was there, the gas leaks repre-
sented a serious problem, since from time
to time, we had to call Bortong or Company,
due to the smell of gas.

Although people from Bortong or Company
checked, the problem continued, since the
pipes were never changed and seemed
deteriorated and Vulnerable to the problem

(SEE ATTACHMENT A: BOSTON FIRE DEP. REPORT)."

36) Virgilio worked for William' store until about August, 1988, when he moved back to Jamaica Plain, MA, to live with his other brothers, including Santo with Wife Rosa Ruiz.

37) On October 18, 1988, Virgilio started working at the Park Plaza Hotel, full time on the day, and at Northeastern University, at night, during College vacations.

38) On or about January 4, 1990, Virgilio had on-on-the-job accident, at the Park Plaza, while walking down, with a tray of pitchers of water on the stairs from the first floor to the mezzonine of the hotel. Subparagraphs 22-23.

39) On January 19, 1990, Santo' son Emmanuel was born, and since he cried too much, their brother "Pablo" Ruiz told Virgilio that since he could not sleep, to move with him and "Federico" Ruiz, their other brother; so he accepted to move back, temporarily to Roxbury, in about March, 1990.

40) While Virgilio was living in Roxbury, Santo told him that since William had moved his store down to the next block, they had talked about the availability of the premise; and that as he did not have a legal status and

did not speak English, it was impossible for him to install a store he was thinking about, unless someone helped him in its transaction.

41) Under the given circumstances, plaintiffs agreed that, Virgilio would help Santi without his physical involvement, due to Virgilio's health condition.

42) The organization of the store was made as it was being installed; under the old William's lease, until August; registration in August; alarm system in September; and insurance in about November, 1990; under the name of "Brothers Fashion", standing after all the family brothers.

43) On about the second quarter, and in November of 1990, a gas smell or leak was reported by plaintiffs to Boston Gas and they showed up in both occasions, at the store.

44) At a second meeting at the store, in about November, 1990, a - forty-thousand dollars, to be increased in the future, was satisfactorily agreed between plaintiffs and defendant Robert Gold, for the police-, which was to be carried by Commerce Insurance, co.; (Subparagraphs 26-27.

C) DELIBERATE Misrepresentation - perjury

-16-

against plaintiffs by Boston Gas at trial.

45) Despite the above material information, Boston Gas Co. denied having records of it-calls and services for the gas leaks during the trial against plaintiffs, on June 13, 1994 as follows:

Q. "Now Mr. Keefe, are you aware that Boston Gas searched for records concerning reports for repairs for leaks at this building?

A. I am.

Q. And, are you aware that the search went as far back as 1984?

A. Yes.

Q. Now, that is information that normally would be maintained in the records of Boston Gas, correct?

A. Yes.

Q. Isn't it true that Boston Gas found no reports and no records for repairs for leaks at the building from 1984--

A. Yes.

Q. --Forward? What is your answer?

A. Yes."

46) Contrary to Boston Gas testimony,

was Santi's testimony, during trial on June 20-21, 1994, as follows:

Q. "You're aware, Mr. Ruiz, that the Boston Gas Company has no records whatsoever of a gas leak or service call for November 1990.

A. It's either because they didn't do it, or they got rid of it. But, he called. He called them.

Q. Mr. Ruiz, you also aware that the Boston Gas company has no records whatsoever from 1984 through 1990 of any gas leaks at the building.

A. From '84 to when?

Q. through 1990.

A. And when my brother called Boston Gas because it smelled like gas and you had to open the door for them, where's the record then?"

D) UNEARTHING the coverup and disclosing of the ineffective assistance of Counsel against Plaintiffs.

47) The tangled investigations originated subsequent to the fire, pushed investigators to face two alternatives as to the cause of the fire, and this was revealed during trial, on June

-18-

13, 1994, by MR. ROY "BURRIL" of the Arson Squad, or follows:

Q. "Do you have an opinion based on your training and experience as to what, if anything, could have caused an explosion like that?

A. Either a gasoline --

Q. Back up. Do you have an opinion?

A. I do.

Q. What is that opinion?

A. That a gasoline or a natural gas explosion took place."

48) Although not produced before the jury, but to prejudice the whole proceeding of the court, as it did at the investigation stage, allegedly, subsequent to the fire, a wood sample was taken from the store, by firefighter Joseph "Murphy", who then, concluded in his test or accelerant, but specifically, gasoline.

49) In the pursuit for the alternative cause of the fire, plaintiffs requested to their counsel said wood sample for a separate expert for a gas chromatographic test, but even though this was lost handled by mr. Murphy, it was reported to be lost, and without calling him to testify, the material prejudice was left to the court discretion as

addressed on June 6, 1994:

MR. DOHERTY: "I assume it is under Trombetta and it is not on the point that the court would like on the 403(b), but there's a lot of language about the type of sample that is missing."

THE COURT: "That's fine."

50) On April 12, and on May 8, 2000, Virgilio filed requests pursuant to the FOIA, to the BFD and arson Squad, to release all materials relevant to the continued legal actions, but their service did not add any substance to this matter.

51) On June 9, 1994, during trial, Mrs. Hamilton denied knowledge of the gas leaks in her building, as well as the Boston Gas did, (Sub) paragraphs 45-46, but her false testimony was followed by a side bar conference as to the disclosure of the covering and the ineffective assistance of counsel:

Q. "Well, you say there was gas meter in the building, I'm talking about the store itself, 1951. Do you remember the left rear of the store?"

MRS. SYLVIA HAMILTON (owner of the building)
A. "I don't call to mind that the gas meter was there.

Q. Okay, do you recall having any trouble at any time around December of 1990 with your gas service? did you have any problem or any reason to call the gas company?

A. Not that I know of.

Q. Do you recall any of your tenants complaining about it?

A. No.

MR. CLOHERTY: Your honor, I would like to object because I would like to know Mr. Doherty's basis for asking the question.

THE COURT: I'll see you at sidebar."

(Sidebar Conference)

MR. DOHERTY: "Your Honor, last night I received a fox from the Government indicating that they were going to use records from Boston Gas Company with materials relating to the gas service at that particular location, part of which I can't read, but part of which indicates there was an examination made at least at 1955 as to the gas."

MR. CLOHERTY: "Your Honor, what was foxed was a response to yesterday's argument regarding Boston Gas and I would also attached a letter that said they have searched

-21-

their records for any complaints regarding the gas from the date 1984 up to the date of the fire and that there was no problem. In fact, the records have been provided to them. I think the question as to whether there is a good-faith basis follows this line of questioning."

MR. DOHERTY: "May I just consult with my partner for a second?

Your Honor, the defendants have obtained from the fire department a record of a problem for a check on gas at that location. Mr. Feinberg and Mr. Komholtz have the record and that is my basis for inquiring."

THE COURT: "Do you plan to use those records in your case in chief?"

MR. FEINBERG: "I don't know yet, Your Honor."

THE COURT: "Why don't you know? You made an opening argument --"

MR. FEINBERG: "I didn't say anything about gas in my opening argument."

THE COURT: "Somebody was talking about gas yesterday."

MR. FEINBERG: "That was yesterday,

that wasn't — "

THE COURT: "there could have been various — "

MR. DOHERTY: "I won't pursue the line of inquiry, it's not a major portion — "

THE COURT: "But you have got a document that you intend to offer and you are obligated to turn it over. As a practical matter she said she didn't get it so you can move on."

MR. DOHERTY: "RIGHT."

(sidebar Conference concluded)

52) Despite all the above, and following matters, and after the BFD's report of gas leaks was discussed and excluded in the back of the jury and Plaintiffs, none of which were allowed at sidebar, this was served to them for the first time after trial, in about July, 1994, through mail by counsel at PCCF.

53) The following is an excerpt of said BFD's report which represents their service for gas leaks, on June 1, 1989, indicating this as a "code 411" for "odor of Gas, Gas leak (Domestic or LP)", and is headed as follows:

-23-

"Incident Number: 18527; Alarm time: 2005;
Inc. Type: 411; Tot: 1; Location:
1951 Columbus Av.; Remarks E-42, 28, L-10,
R-02; MIN. 30."

54) In Closing arguments, on June 21,
1994, the government told the Jury as follows:
MR. CLOHERTY: ".... They'll also
tell you that there was no record, no
record of any service call in November
1990, and more importantly, no record
from 1984 through 1990. Ask yourselves
his motivation when he tells you that
the gas company come, but there's no
record."

55) Without admitting the above BFD Re-
port, (Subparagraph 53, on September 27, 1994,
in a written memorandum and order, the court
denied plaintiffs' motions for a new trial and
for judgment of acquittal.

56) At the next presentencing hearing held
on November 4, 1994, the BFD report was discussed
as follows, Defending their lack of knowledge
of this, as in (Sub) paragraph 51; supra:
THE COURT: ".......and, there is now
some evidence and I think I got this
from Mr. Feinberg, that there was a
gas fire on those in June of 1989.

-24-

I am not sure that that evidence was admitted at trial.

- - - - - - - - - - - - - - - -

THE COURT: "But I think you all ought to talk and conceivably if you agree you should have a new trial and conceivably you can agree on something else, I don't know what else -- there is a problem in case like this. It is not created by anybody here around the table. But there are cases that by nature investigated first by the FBI or the DEA, and I am coming to learn to be very comprehensive and you don't have or many loose ends sometimes."

THE COURT: "....

There are a lot of questions here. And, the government wasn't obligated to answer all the questions. You know, when they take the clothe and where did they go? How did they get them out? That is not an element of the offense.

But, let me ask you this because I haven't gone back through all my notes and I see we have got some of the transcripts now. Is there some new evidence that I have been presented in sentencing on this gas fire that didn't come up at trial?"

-25-

MR. CLOHERTY: "There is, I think, two things and I come up at trial but not in evidence. One is a report of Boston Fire Department that they responded to in 1951 and 1955 and in June, 1989 and they are coding -- the number they put down in the report references a gas fire. There are documents that --"

MR. FEINBERG: "Odor of gas."

MR. CLOHERTY: "Odor of gas, not a fire. That was by Mr. Feinberg and Mr. Campbell that that come accross. There was also, your honor, a fire. ..."

**57)** At the hearing of November 4, 1994, the BFD report had been disregarded by ineffective counsel, as ambiguous just because was in "CODE" as opposed to "Xplicit", as in the BPD report (Newly Discovered Evidence), Paragraph    , infra:

MR. CLOHERTY: "The other thing provided to the government today was Mr. Keefe testified at trial that Boston Gas did a search from 1984 to the time of the fire whether there were any gas leaks or there weren't. Underlying that testimony was an internal Boston Gas Memorandum which was not produced in evidence at trial. It was produced as part of the Sentencing exhibit today, I believe exhibit 3."

MR. FEINBERG: "Isn't it contradicted by the exhibit we have?."

MR. CLOHERTY: "Well, that's the Boston Fire Department report. And quite frankly, you have had that report since June and we have yet to hear anything else from anybody, either the Boston Fire Department or the Boston Gas Company."

MR. FEINBERG: "I am not sure I understand what you are saying."

MR. CLOHERTY: "Boston Gas said that they never responded to the scene, that there had never been any report of any gas odor. The report you have --"

THE COURT: "Excuse me, what?"

MR. DOHERTY: "I believe, your honor, it is not inconsistent because -- the two are inconsistent but the Boston Fire Department report is vague at best and may simply be wrong in the coding. I think the evidence was clear that Boston Gas certainly considers gas leaks and gas odors a very serious matter and does everything in their power to document them."

58) At the next presentence hearing held on December 22, 1994, in a call of conscience,

-27-

counsel recognized their ineffectiveness in
not pursuing to a reasonable degree of effi-
ciency, the line of the gas leaks before the
jury, as follows:

    MR. DOHERTY: "- - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - -
the normal course of events, your honor,
and perhaps mention should have been
made of that at the trial and I'll take
the blame for not having done that.
    In my view there was another
alternative explanation for the fire,
even though the gas leak did lend cre-
dence to testimony by the defense case.
I think in the best of all possible
worlds I should have introduced that."

- - - - - - - - - - - - - - - - - - - - - -
    THE COURT: "Let's see if we're--
actually, what is the document to which
you are referring?"
    MR. DOHERTY: "It is a Boston Fire
Department report, your honor. It does
appear to be Tab G of Virgilio Ruiz's
memorandum and it has codes--"
    MR. FEINBERG: "Your honor, if you
note there's a code 411 and if you turn
the page, you will see 411 is the reference

to the odor of gas. I'm not sure of the exact quote."

59) At the Sentencing hearing held on December 23, 1994, the court went through the Presentence Report ("PSR"), which was prepared by probation officer Thomas "Griffin", and opted to deny the gas leaks as follows:

THE COURT: ".... objection 7 goes to whether the gas company went when the fire department noted on June 1, 1989, an odor of gas or a leak. Mr. Cloherty provided more gas company records indicating they didn't know.

The defendant says it is inconceivable that they didn't know if the fire department smelled an odor, but bureaucracies don't communicate or interact perfectly.

Again, I don't think this is really material to the Sentencing, but do you want to be heard on this, Mr. Komholtz?"

MR. KAMHOLTZ: "Judge, it's only material in the sense that objection 6 was material and that these defendants have a firm subjective belief in their innocence. And they are not making these charges of gas leaks out of whole clause. and, in fact, the fire department did know."

THE COURT: "Well, the fire depart-
ment went, but you're using that to try
to establish that the gas company went.
And the gas company records don't re-
flect a visit.

Mr. Cloherty filed some more records,
didn't you?"

MR. CLOHERTY: "Yes, your honor, a
memorandum."

60) In response to Mr. Griffin's questions
for his PSR, Messrs. Pablo and Federico had
specified that:

"... it was a gas leak, for which
the gas company had been repeatedly called...
they stated that the building had a histo-
ric problem with gas leaks; ..."

61) In a letter submitted to court for the
purpose of sentence, Mr. Federico referred as
follows:

"During the time that I was there,
there was an intermitently odor of gas leaks,
which I believe was due to the condition of
the pipes.

"The fire on the night of December 16,
1990, I strongly believe was caused by the.
gas leaks.

"The night of the fire, a neighbor

-30-

from the above floor knocked and yelled "fire" on the door of the apartment."

62) Eventually, on June 22, 1994, the jury rendered convictions or to the alleged charge, and on December 23, 1994, Judge Mark L. Wolf Sentenced S onto to 93 months incarceration, and Virgilio to 108 months; aside or to each, 3 years of supervised release, and a mondatory $200 special assessment, in an adoption of the adopted Version reflected on the PSR as follows:

"According to the government testimony at trial by Boston Gas official Jack Keefe revealed that there was no record of Boston Gas ever conducting a service call at that location."

63) Based on the facts throughout this action- above and below, on December 26, 1994, Plaintiffs agreed with William, Pablo and Federico, to pursue an investigation.

E) REQUESTS OF AN INVESTIGATION AND FOIA's to the Federal authorities by plaintiffs.

64) On January 3, 1995, plaintiffs requested an investigation to the U.S. Attorney General, then, Janet Reno.

65) On February 21, 1995, again, plaintiffs requested an investigation to the U.S. Attorney

General, since they had diverted the first request to the BOP.

66) On November 14, 1996, plaintiffs requested an investigation to the U.S. Attorney General; and also, to the U.S. President, Bill Clinton.

67) On October 24, 1997, again, plaintiffs requested an investigation to the U.S. Attorney General.

68) On December 30, 1999, Virgilio filed an FOIA request to the FBI, but they responded that they had no involvement in the case.

69) On December 30, 1999, Virgilio filed an FOIA request to the ATF, whose response through the U.S. Treasury Department did not add any substance to this matter.

F) REQUESTS OF AN INVESTIGATION AND FOIA'S to the State and local authorities; and entities by plaintiffs.

70) On November 8, 1994, plaintiffs requested an investigation to then, Governor William F. Weld; Mayor, Thomas M. Menino; City Representative, John E. McDonough; and City Councilor, Charles Yancey.

71) ~~On~~ or about October, 1996, plaintiffs

received a notarized statement by William, which he submitted to Santo's Counsel, Mr. Doherty, who submitted it to the BPD, requesting for the second time, William's briefcase with personal belongings that they collected and seized from the Ruiz brothers apartment, the night of the fire.

72) On December 30, 1999, Virgilio filed an FOIA request to the then, Boston Gas Company, but they did not respond.

73) On April 12, 2000, Virgilio filed on FOIA request to the then, Boston Edison Company, but they did not respond.

74) Also, on April 12, 2000, Virgilio filed FOIA requests to Boston Police Department; Boston Fire Department / Arson Squad; and again, on May 8, 2000, to Boston Fire Department, Whose response, except for the BPD, did not add any substance to this matter.

75) In the process of his due diligence, Virgilio talked to the BPD on July 7, 2000, and was told that (1) his request was being served on that very day; (2) they did not have William's briefcase; and (3) this should be claimed to the city hall.

76) On July 11, 2000, Virgilio received the service made by the BPD, including the report

of the gas leak of June 1, 1989 ("Newly Dis-
covered evidence"), which states as follows:
        "About 8:16 P.M., Officer
McMillon responded to a radio call in
the E 412E car for a report of gas
leak at 1951 Columbus Ave., Jamaica
Plain. On arrival, the officer observed
the strong odor of gas (natural) coming
from inside the above location. Ladder (#10),
rescue (#2), i.e., Chief Mullins responded
to the scene and building was evacuated.
Boston Gas Co. also responded and the leak
was temporarily capped in lieu of further
repairs requested by Denner, William - a Boston
Gas Supervisor."

    G) THE FIRE and the events that
Surrounded it.
        77) In the evening of Saturday, De-
cember 15, 1990, as usual, Santo closed up his
store, and took bus #22 of the Public Trans-
portation, which was in the face of the store,
and headed home to Dorchester, where he stayed
with wife, "Rosa" Ruiz and their, then, two chil-
dren.
        78) Santo took the public bus, due to the
fact that his only Vehicle was in repair process,

as a result of an accident, when a taxicab crashed on it, sending him to the nearest hospital, on December 1, 1990.

79) Early in the morning of Sunday, the 16th, Santo was informed by Pablo's phone call of the occurrence of the fire that or the BFD reported originated in the basement store, at about 2:00 A.M. of that day.

80) As Virgilio declared to investigators and deposed on October 7, 1991, the night of the fire, despite it was raining, was as usual for him.

81) As Virgilio stated, on that night, he did not get out of the apartment, after Santo closed his store, and was there at the time that Pablo and Federico arrived after closing up Columbus Market, where they both were working paragraph _____, infra.

82) As Virgilio stated, on that night, he went to bed, leaving his brothers, Pablo and Federico, watching TV in the living room, which deforation door from this room was right in their faces, at about 11:30 P.M., or Midnight.

83) As Virgilio stated, because he was sleeping in the front of the FIRST floor apartment, sometimes the noise from the street would wake him up, and that night, in this sense, was not different.

-35-

84) As Virgilio stated, a very old gas heater that was located in the living room, used to expose smoke, but contrary to the routine, he woke up to the smoke entering to his bedroom, which was a few feet away.

85) As Virgilio stated, he attempted to inquire the source of the smoke, but heard an explosion at the basement, thus, proceeded to alert his brothers Pablo and Federico; while simultaneously, someone known later to be Mr. Jorge "Arroyo"- a neighbord from the third floor, was banging and yelling at their apartment door, alerting of the fire, and to escape through the back of the building, paragraph 88, infra.

86) Eventually, not seeing Mr. Arroyo, in the rush to leave the apartment, with the door that leads to the sidewalk, Virgilio hit his head, left eyebrow, etc., which subsequently, subjected him to dizziness and unconsciousness, or, he approached the sidewalk where the flames reached his fuzzy- material socks which produced his burns in the ankles.

87) On June 10, 1994, during trial, corroborated Virgilio' statement, as to his injuries and burns, the testimony of Dr. Robert Demling, who took care of his medical treatment,

as follows:

Q. "Under all the circumstances and given your medical experience, was it your impression that the cut and the bruising was indicative of an injury that may cause a dozing or loss of consciousness? if you know."

A. "It was a sizable cut and a sizable bruise. It could have been."

Q. "So, is it fair to say, that that's the kind of injury that may have also been associated with some -- some effect upon his cognitive ability for even a short -- for a very short period of time?."

A. "It's compatible."

Q. "And, in this case, had mr. Ruiz been wearing polyester socks that melted above his shoes or his slippers, could that have caused the second or third degree burns, or is it consistent?"

A. "Yes, it's consistent."

88) Being the only eye witness that perceived all the events surrounding the fire, mr. arroyo submitted his testimony after trial, in an affidavit, which plaintiffs submitted

in the most immediate opportunity to court,
as follows (original in capital):

2. "I consider myself a true witness
of the events that occurred on the night of
December 15, 1990, at 1951-1955 Columbus
Avenue, Roxbury, MA."

3. "On that Saturday night of December
15, 1990, I had come back home after mid-
night, from a family party that was held on
the same neighborhood."

4. "I had come back home to 1953
Columbus Avenue, Apt. #3, Roxbury, MA,
where at that time I was living with
my relative."

5. "It had been raining and there was
no lights on, in any of the apartments, when
I got home."

6. "I did not go to bed, but instead I
decided to watch television in my apartment."

7. "Some times later, I realized that
there was a fire."

8. "I come down from my third floor
apartment and banged and yelled on the first-
apartment door, for about seven times, but
I did not hear any response."

9. "I did not open the building-exit-front
door, and alerted everyone I could, not to

exit through the front, due to the thick
of smoking and the risk to come
out that way."

10. "Then, I went to my apartment
banging on the second-floor apartment
and alerting people to exit only through
the rear of the building, so they could
escape safely."

11. "When I was helping my relatives
to get out, I did not see any sign of
fire in the back, until after the fire-
fighters broke the basement rear door."

H) THE EVENTS preceding the fire.

1) THE ALARM WAS NOT activated
the night of the fire, due to false alarms.

89) Occasionally, the alarm
had gone off, and at least on the latest, which
was on or about December 7, 1990, Boston police
showed up at the store, at about 11:00 P.M.,
but they could not have access because Santo
had the only key to open, in Dorchester.

90) The following morning, Plaintiffs
realized that the alarm had gone off
due to the rats that were running back and
forth, from the other side of the basement,
carrying any kind of foods, especially, Candies from

the store.

91) To solve the problem of the rats and onsid paying the police service for false a-larms, Sonts decided to stop activating the a-larm system, and proceeded to extinguish the rats, by placing traps and poison in growls, both which he bought in Ashmont Hardware on Washington Street, Roslyndale.

2) <u>THE FRICTION between William and the arson squad investigator's brother-in law, MR. Miguel "CANO" Balaguer.</u>

92) In the Summer of 1989, Virgilio went to hand a wedding gift to his cousin, MR. "Hector" R. Ruiz, at the apartment–1953 Columbus Ave. #1, Roxbury, which Pablo and Federico took over, later.

93) Hector was marrying his fioncee, MRS. Mireya; the sister of Marisol, and this was married with "CANO"; and also sister of MRS. Vasquez, the wife of MR. "Gab" Vasquez, who served as the leader investigator of the fire, later, paragraph 104, infra.

94) In that occasion that Virgilio was there, MRS. Marisol was with William in one of the rooms, while cano was attending his Columbus Market right below, at the site of

the incident in question.

95) In that occasion, Hector's remarks were that he was "perceiving a very bad friction between William and Cono, due to the love triangle that involved them and Marisol."

96) In about March of 1990, while Virgilio was coming back from a morning therapy, he saw Cono inside the laundry that was in the corner of Washington and Atherton streets, which is the very next block from the store.

97) As Virgilio approached Cono and asked him why he was looking so stressful and humble, while crying, he told Virgilio that "William had broken my marriage of twelve years," in an unfaithful relationship with his wife Marisol.

98) On about the second quarter of 1990, while Pablo, Federico and Virgilio were gathered in the living room of said apartment, Cono visited them, and crying stated that he was "going to find Marisol and bring her to William store and with a gun, I'm going to kill them both, for destroying my home and happiness."

-41-

## 3. VIRGILIO'S WORKER COMPENSATION
and the wrong presumption of its investigators.

99) The fact that Virgilio helped Sout's in the transaction of his store, as specified, Paragraphs 40-42, supra, originated on investigation that only proved the collusion that took place, before and after the fire;

Although this was brought to a conference in the Industrial Accidents Court ("IAC"), on December 6, 1990, it was not until April 9, 1991 that the East Coast Investigations presented their case in a hearing as follows:

Q. "Did you have any conversation with him in the store on that day? (August 3, 1990).

A. "... I greeted Mr. Ruiz and I just indicated I was interested in real state. I understood the building had been for sale...

... He told me he hoped I would buy the building because they didn't like the landlord, Sylvia Hamilton."

Q. (By Ms. Carroll) "is there anything you haven't told us yet about in regards to what you observed in the store or outside the store with Mr. Ruiz?"

A. "Well, When I was inside the store, after we -- I think we left off, he handed me a piece of paper with the landlady's phone number on it. He bent over and picked up this brown bag. He wrote down 'Sylvia Hamilton, phone number 522-9748,' and, handed it to me. I asked him who should I say, you know, I spoke to, got the number from? He introduced himself to me as Roy, R-O-Y, Roy and he extended his hand and shook my hand.

100) The East Coast investigators interacted with the parties related to the matter of the fire, since as they had expected it, they had a poor case, as judge John "McKinnon" concluded, but there was a prejudice in place, preplanted in court already, on this april 9, 1991, hearing:

JUDGE: "It appears to be a burnt-out building. I have a problem here. I'm sorry. You know, you got a video. You've got pictures. I mean, the idea of following and investigating and following these people around is to try and catch them working. I don't see anything yet so far as him actually doing physical work."

-43-

# THE FRAME

I) THE LINKAGES OF THE PRE AND POST FIRE EVENTS IN ORCHESTRATING THE COLLUSION BETWEEN DEFENDANTS, WERE EFFECTED AS FOLLOWS, BUT NOT LIMITED TO.

1) THE CONTACTS made from the East Coast Investigations were as follows, but not limited to:

101) From a date not known, but subsequent to the IAC's conference, as presented in paragraphs H(3) 99-100, Supra, and until a date not known, the East Coast Investigations established contacts with Mrs. Sylvia Hamilton, as follows, reflected in their report at 11:

"In addition to contacting the landlady, it is recommended that additional hours be approved so that additional surveillance can be conducted to document the claimant's activities."

102) Defendants Hamilton, and Greenaway, for not changing the faulty gas pipes, and for the lack of smoke detectors, as specified at trial on June 8, 1994, shared their common interests with other defendants to protect themselves from the present liability:

Q. "But the lack of smoke detector, does, does it not?

A. "The lack of smoke detectors would

-44-

be in violation of the fire laws; yes."

**2.** THE CONTACTS made from the Phoenix Investigations were as follows, but not limited to:

103) As reflected on their reports, Phoenix Investigations established contacts with the Squad investigators, as follows, but not limited to, on "Tuesday, February 5, 1991":

"'On this date, on interview was conducted with Lieutenant Burril, Boston Squad. Burril stated substancially the following:

'The building was secure when the fire department personnel first arrived.

An injury occurred to Virgil Ruiz, a tenant on the first floor. His feet were burned. Burril later learned that Ruiz owned the business being run below the first floor apartment.'"

104) On December 17, 1990, at about 7:00 P.M., Virgilio had been interrogated at the Brigham and Women Hospital, regarding the fire, by Mr. Vosquez, who for language convinience was leading the investigation with colleague Burril; see paragraphs 4 (2) 93, supra.

-45-

105) As the following remarks indicate, the conclusion of suspicious of arson on the BFD and squad reports, as well as the alleged lost-wood-sample-test in paragraphs 48-50, could not be based on the facts, but on their subjective preset minds:

"Virgil on workmen's comp. ordered by judge no more workmen's comp. Cost insurance in reimburse."

"Bob McCormack adjuster-commerce Ins."

106) On February 12, 1991, which is seven days after their first contact with Phoenix, paragraph 103, supra, the squad arrived to a result or to the alleged wood sample test, but could not follow it up, later, for the above and below reasons.

107) As reflected on their reports, defendants Phoenix established contacts with defendants East Coast investigations, as follows, but not limited to, on "wednesday, March 27, 1991:"

"On this date, a telephone call was place to East Coast Investigations, Auburn, MA (1-505-832-0605). East Coast had performed a worker's compensation investigation on a claim by Virgil Ruiz.

-46-

"The Secretary stated that the person to speak with regarding this matter was Carl Westermon. A message was left for Mr. Westermon."

108) As reflected on their reports, defendants Phoenix established contacts with defendants St. Paul Fire & Marine Insurance Company, as follows, but not limited to, on "Wednesday, October 9, 1991:"

"On this date, telephone contact was made with Betty Chark, an adjuster with St. Paul Fire & Marine Insurance Company. She had handled Virgilio Ruiz workmen's compensation Claim.

"Ruiz had worked at the Park Plaza Hotel, and was injured on January 4, 1990. He was paid $220.59 per week. The last payment was made on December 6, 1990.

"Clark stated that more details could be obtained from her investigator, Jim Collins, but that there had been a conference on December 3, 1990. At that time, Ruiz was confronted with employment at Brother's Fashion and Services, and with evidence of an ownership in that business. The court ordered that benefits were to cease. A hearing was still pending."

-47-

109) As reflected on their reports, defen-
dants Phoenix pursued contacts with defen-
dant East Coast investigations, as follows, but
not limited to, on "Friday, October 11, 1991:"

"On this date, telephone contact was
made with Collins. He stated as follows:

'During his investigation, he had
developed both surveillance and photo-
graphic information about Virgilio Ruiz.
There was initially some difficulty in
finding him as he was using mail
drops. He was eventually traced
to Brother's Fashion and several
undercover conversations took place
inside; there was some stock in the
store.'"

'St. Paul had given him per-
mission to forward copies of his
reports to the phoenix office and
he would do so immediately."

110) On October 7, 1991 and October 10,
1991, Virgilio and Santo, respectively, Volunte-
red their depositions to defendant Commerce
legal representative.

111) As reflected on their reports, defen-
dants Phoenix established contacts with defen-

-48-

donts BPD, as follows, but not limited to, reporting William's briefcase, paragraph , infra:

"A briefcase was taken from the first floor apartment of 1953 (Columbus Avenue, by the Boston Police."

112) As reflected on their reports, as follows, defendants Phoenix took per guaranteed that said briefcase, paragraph 111, was the one referred by Virgilio in his deposition, as a container that Sonto used to carry papers, and thus, they created a false pressumed premeditated factor in their belief and linked the personal belongings (i.e., Jewelry, documents, etc.), that the Police had collected from the Ruiz' apartment, with the merchandise burned in the store:

"We have located the insured's briefcase at the Boston Police evidence room. They will release it only to the owner, but are making no effort to notify him."

113) Even though the FAC-Judge John McKinnon had predicated a conclusion in Virgilio's favor, at the conference, on April 9, 1991, paragraph 100, supra, the atmosphere of the pre-

sent collusion, created on unsteady mind for his decision, on November 5, 1991, against Virlio, whose appeal therein, for said reasons, he withdrew on November 19, 1991, despite his back problem is persistent and for ever.

J) WIPING OUT THE CLOUDS upon completing disclosure of the ulterior motive to FRAME plaintiffs and thus, the deliberate ineffectiveness of Counsel, too.

1) AS to claiming the briefcase-continuous prejudice for its retention by the BPD.

114) The briefcase that the BPD seized from the Ruiz apartment, the night of the fire and which investigators thought belonged to the store, was claimed by its owner, William, as specified in his affidavit of July 20, 1997:

"17.- The day after the fire, I also went to the Police Department to claim my briefcase with personal belongings, which they seized from the apartment (SEE ATTACHMENTS B: (1) INCIDENT CLAIM REPORT; AND B(2) MY NOTARIZED-CLAIM STATEMENT)."

115) As William specified, he resubmitted a claim in his "NOTARIZED-CLAIM STATEMENT," due to the fact that the continued detention of

his briefcase was causing a prejudicial factor, as it did, against plaintiffs, since this was not relevant in the sense that it did not belong to the store, as the investigators believed; paragraphs 111-112:

18.- That briefcase was left there, with my brothers' consent, as they were living there, and there is no reason for the police to withhold it, since it does not have anything to do with the present matter, and thus, is absolutely irrelevant to this case (SEE ATTACHMENT C: INSURANCE INVESTIGATION REPORT).":

"We have located the insured's briefcase at the Boston Police evidence room. They will release it only to the owner, but are making no effort to notify him."

2) AS TO THE VENDETTA Pursued by the Boston Arson Squad, paragraphs H(2)92-98 Supra.

116) As specified in paragraphs H(2)92-98, supra, and as follows, upon corroborated testimonies, in affidavits of Hector and William's, submitted on October 30, 1996, and July 20, 1997, respectively, the Vendetta pursued by Mr. Vasquez,

especially, if his colleague, Mr. Burril did NOT Know of his plam, was inclined to the alternative of arson, deliberately and regardless of the true facts:

19.- "Prior and during the investigation of the instant case, a named Miguel Balaguer (CANO) was alleging that I had broken his marriage with wife - of so many years. He obsessionally alleged that I had had an affair with her, which again, should not be relevant to the aforesaid Case.

20.- However, as the Key investigator in charge of the instant case, Mr. Galo Vazquez, was Mr. Balaguer's compatriot and brother-in-law, as they were from the same native island and married with two sisters, a conspiracy against all the Ruiz' brothers was orquestrated by the privates and governments investigators and witnesses (SEE ATTACHMENT D: AFFIDAVIT OF MR. HECTOR R. RUIZ)."

3.- "After the incident occurred on the night of December 16, 1990, at 1951-1955 Columbus Avenue, Roxbury, MA 02119, I met in separated occasions, Mr. Miguel Balaguer, whose

-52-

nickname is Cano; and Mr. Galo Vasquez, investigator for the instant case."

4.- In one occasion, while we (Mr. Miguel Balaguer) coincided at a family party held in Hyde Park, MA, he confessed to me that he "'wanted all the Ruiz' brothers in Prison'" and that he was "'cooperating for that purpose with his brother in-law, Mr. Galo Vasquez, who was in charge of the investigation, and Mrs. Sylvia Hamilton, the owner of the property where the incident occurred'."

5.- One of the reason, for which Mr. Miguel Balaguer (Cano) wanted the worst for the Ruiz' brothers, as he said, was that "'one of the brothers, Mr. Rafael William Ruiz, had broken his marriage and as he was the owner of the store where the incident occurred, all the brothers would be in trouble.'"

6.- The investigator, Mr. Galo Vasquez; Mr. Miguel Balaguer (CANO) and I were married with three sisters, and as brothers-in law, from time to time coincided at the same places.

21.- "Thus, as Mr. Miguel Balaguer's marriage no longer existed, and as he believed that the burned-Sonts store was mine, the investigators indiscriminatively used him to prepare the frame for the Ruiz brothers."

22.- "After the team of the arson squad investigators, English-speaking Roy Burril and Spanish-speaking Gato Vasquez went to interview my brother, Virgilio Ruiz at the Brigham and Women Hospital, Mr. Gato Vasquez was meeting and hanging out with Mr. Miguel Balaguer in the neighborhood of the incident."

23.- On one day of December, 1993, while my brother, Sonts Ruiz was committed working in my store, as part of his condition release, Mr. Miguel Balaguer passed by the sidewalk and in a delivered manner, pointing at my store, shout at his friends on the corner: FEDERAL!, meaning that my brothers were involved in a federal case as a result of the incident of December 16, 1990."

117) As addressed during trial conference

On June 8, 1994, there was also, a persistent animosity or bad blood, which was even perceived by counsel, between defendant Hamilton and William, and which interfered with her impartiality of judgment before the jury, and throughout the preceding encounters with investigators, paragraphs B 34, supra:

3) AS TO THE DAMAGED INFERENCES inflicted by investigators for the worker compensation, paragraphs H (3) 99-113, supra.

118) On June 10, 1994, during trial conference, the clouds of the worker compensation matter were wiped out, despite the darkened upcoming proceedings, paragraphs H (3) 99-113, supra.

( CONFERENCE )

. . . . . . . . . .

MR. FEINBERG: "We have -- on the other issue, we have some new information. It's not necessary that we do that now."

THE COURT: "On what other issue?"

MR. DOHERTY: "The Workmen's compensation issue of alleged fraud?"

THE COURT: "What's the essence of it?"

MR. FEINBERG: "The essence of it is, we have obtained documents from the attorney

that represented MR. Ruiz at the time of
the hearing to the effect that on Decem-
ber the 20th, a letter was written to
MR. Ruiz in Spanish, essentially
saying: "Please contact us. We've got
the ruling." On the same date,
December the 20th, there's a note
in the file: "Speed letter to call the
office." Then, "on 1/7/91, spoke to
Plaintiff re: Order. I told him that
I wanted to explain it. He said he un-
derstood what I told him and if he
had any questions he would call us."

So, the reason I raise this is that
it seems to me that the whole motive
issue is totally dependent factually
on the fact that the defendant must
have gotten notice prior to the 16th.

MR. CLOHERTY: "The defendant's law
firm was cc'd on the letter that was
sent to the defendant. The letter is
dated December 11th. The Massachusetts
Board of Industrial accidents is going to
say that at the time the letter was
stamped, December 11th, it was mailed
to all parties. Quite frankly, that con-
firms that the law firm received it.

I think that there's a reasonable in-
ference that based on that, that the de-
fendant would have received it
as well.

THE COURT: "All right. Okay, well,
it's helpful to have that information....."
119) On November 25, 1996, Miss Lisa He-
rrera submitted her affidavit, which as fo-
llows refutes the government's attempt to as-
cribe a negative ruling in the worker's com-
pensation dispute as a motive for Virgilio to
commit arson:

3. "I was secretary/interpreter at
Patrick J. Iarrobino law firm, located
at 100 State Street, 3rd. Floor, Boston, MA,
during Mr. Virgilio Ruiz' worker compensa-
tion claim, after his on-the-Job acci-
dent, on January 4, 1990."

4. "The lawyer that represented him
was Mr. Joseph Collins, Esq., who han-
dled his legal claim, while my function
was as his secretary/Interpreter."

5. "Although a conference concerning
his worker compensation claim was held
on December 6, 1990, it was not until
April 9, 1991 that such matter was brought
forward for a hearing in the Department of

<u>INEFFECTIVE</u> not only as presented in paragraphs 51-61, supra, but also as follows, and not limited to, for failing to call and bring to trial plaintiffs' witnesses.

120) Aside their failure to follow plaintiffs assertions of the facts and thus, failure to discover evidence in their favor; knowing that plaintiffs were under a sequestrating order, counsel failed to bring to trial the following witnesses, but not limited to:

A) Mr. Hector R. Ruiz and Mr. Rafael Ruiz, as the witnesses of the ulterior motives and vendetta of the investigators, etc.

24.- "On May 13, 1994, at 10:00 a.m. (Eastern time), I was interviewed in my store, by attorney Matthew Kamholtz, from Segal & Feinburg (210 Commercial street, Boston, MA 02109), who was Virgilio Ruiz' counselor and to whom I gave my testimony and copies of the reports of complaints of gangs disturbances - to the West Roxbury court and also among of those important papers there were documents of my store."

25.- "On June 9, 1994, again, I was interviewed at <u>SEGAL & FEINBERG'S OFFICE</u>, at 1:15 p.m., by attorneys, John Doherty (Mr. Sont Ruiz' counselor); and Matthew Kom-

holtz and Matthew Feinberg (Mr. Virgilio Ruiz's Counselors). Also, I appeared in court, but I was not called to testify, despite I was willing to.

**B)** Mr. Jorge Arroyo, as the alibi witness; (In Capital):

15.- "On March 29, 1994, Mr. Virgilio Ruiz brought me to be interviewed by an attorney at SEGAL & FEINBERG, at 210 Commercial Street, Boston, MA 02109."

16.- "I was interviewed there, by Mr. Matthew Kombaltz, at 10:30 A.M. (E.T.), where I explained what I could perceived on the night of the incident.

17.- "On or about June 15, 1994, I was subpoenaed by the United States District Court to give my testimony in court. However, apparently, my testimony was not necessary as the Ruiz' brothers' counselors had informed. So I was not called to testify.

18.- "On or about September, 1994, I was contacted by the United States probation officer, Mr. Thomas Griffin, but we did not get together for the interview as we first agreed, and instead,

however, I answered a few questions that
he had (over the telephone) con-
cerning the incident.

C) Miss Lisa Herrera, as the witness
of the worker compensation and thus, not clo-
sing the door for the character witness, and
outstanding records in the community pertaining
to plaintiffs:
9. "On June 9, 1994, upon-
over-telephone request by mr. Virgilio
Ruiz and his court-appointed adviser,
mr. Matthew Kamholtz, I served him
(mr. Kamholtz) the above information
as documented (see attachment C).


K) THE FALSE ARRESTS AND MALICIOUS
PROSECUTION PROCEEDINGS.
1) RELEASE, TRIAL AND POST TRIAL
PROCEEDINGS.
121) Indictments against plaintiffs were
rendered on July 27, 1993, but despite re-
quested by motions, they were never served
the grand jury transcripts.
122) At about 12:30 p.m., on August 2, 1993,
Federico gave Virgilio a phone number to call
given by a presumed insurance secretary.

123) At about 1:00 p.m., on August 2, 1993, in a-three-way call, Virgilio served as interpreter for Sonto and said secretary, and in perspective, all three agreed to meet in North End Square, at about 2:00 p.m., where Sonto was supposed to be brought from, to the office for a check for the payment of his store.

124) At about 2:00 p.m., on August 2, 1993, as plaintiffs encountered the presumed secretary, they were arrested by federal agents under the charges of destruction of defendant Hamilton's building by fire and three related charges.

125) At about 2:30 p.m., on August 2, 1993, plaintiffs were brought before Magistrate Judge Lowrence P. "Cohen" in this court, for a detention hearing, appointing the now defendants Messrs. Doherty, Feinberg (8) and Kornholtz, for Sonto and Virgilio, respectively; and Assistant U.S. Attorney "FUTER" for the government.

126) On August 4, 1993, plaintiffs were brought back before magistrate judge Cohen, for Arraignment and a Bond Hearing.

127) Upon adjournment of the August 4th Bond Hearing: Virgilio was released on recognizance with the conditions of (1) Surrendering of passport; (2) Restricted movements inside Massachusetts; (3) Show up to pretrial, two

work days a week, and call the other three ones; etc

128) Upon adjournment of the August 4th Bond Hearing: Santo was brought back to PCCF where they both had remained housed, since the arrests; until the 6th, when he was released to home confinement, upon posting a fine (5) thousand dollars cash bail, and the conditions of (1) Surrendering of passport; (2) Restricted movements within the distance allowed under the bracelet; etc.

129) A few months later, Santo's conditions were changed as to his working hours at Columbus Market, which was owned by William, and home confinement during the rest of the time.

130) Plaintiffs conditions of release were so fully accomplished that, on or about June 3, 1994, "outstanding" reports were submitted by pretrial services to trial judge Mark L. "Wolf"; — the week before trial, but were never used, later.

131) For trial, Mr. Tuter was replaced for assistant U.S. attorneys Kevin Claherty, and in a wheel chair to get the sympathy of the jury, Mr. John Griffin.

132) On June 6, 1994, on-all-white jury was selected, and among them, there was a juror whose stepfather owned an insurance

agency, and another one was a correctional officer (i.e., strategically, victimized and prejudiced jurors), paragraph 62, supra.

133) After convictions, appeals were turned down by the court, paragraphs D 47-63, and subsequent to sentences, appeals were entered in the court of Appeals, paragraph 62, supra.

134) On April 7, 1995, Santo suffered a head injury when he passed out and fell down in the bathroom of the gymnasium, in FCI- Ray Brook, New York.

135) On October 11, 1996, after a long battle for the release of the trial transcripts and government's exhibits, the Court of Appeals consolidated plaintiffs' timely appeals under Nos. 95-1286 and 95-1287.

136) At the appeal stage, the government submitted its some contentions against plaintiffs, or to the gas leaks as follows, at 10, 11 and 17 (Footnote) of brief:

"Santo Ruiz claimed he had reported a gas smell to Boston Gas approximately one month prior to the fire and Boston Gas made a service call".

"Mr. Keefe also testified that Boston Gas
-64-

created a record of all service calls and
that there was absolutely no record
of any service call prior to the fire."

137) At the appeal stage, plaintiffs sub-
mitted the testimony of the witness not called
at trial, as referred in paragraph J(4)120, Su-
pra, but the court of appeals rejected them,
with the following suggestion, in Footnote 7,
at 1503 of U.S. V. Ruiz, 105 F 3d 1492 (1st Cir.
1997):

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Further, to the extent Virgilio sub-
mits new evidence in support of his re-
quest for new trial, that evidence must be
brought to the attention of the district
court in the first instance, either in a
timely motion pursuant to Fed. R. Crim. P. 33,
or on a writ of habeas corpus pursuant to
28 U.S.C. §2255."

138) Eventually, on February 12, 1997, the
court of appeals withheld the convictions and
remanded for new sentence, with the following
contentions { at 1497 1498 - U.S. V. Ruiz, Supra ):
    " . . . . . . Following the fire, Boston Gas
company, the natural gas provider for the
building, conducted a search of its re-
cords for the period from 1984 through the
-65-

time of the fire for any reports of gas
leak repairs at the building. The
research revealed nothing."

"Santo suggested, that a natural
gas explosion may have contributed to
the fire. Specifically, he claimed
that about one month before the fire,
he called Boston Gas because he smelled
a natural gas leak; contrary to other
trial testimony, he claimed that Boston
Gas personnel then came out to the
store and fixed the leak."

## 2) RESENTENCING PROCEEDINGS.

139) The government kept its conten-
tions, as in paragraph 136, supra, throughout
its filings of resentencing memorandum and
appendix - at 5, and its hearing on June
9, 1997, and January 30, 1998, for Virgilio,
and Santo, respectively.

140) On June 9, 1997, at the resentencing
hearing, plaintiffs moved to dismiss all charges
based on the evidence rejected by the court of
Appeals, paragraphs 137-138, supra, but the court
without considering it, denied the motion without
prejudice.

141) On June 9, 1997, Virgilio was resentenced

-66-

to 98 months' incarceration, under the same government's contentions of lock of records of gov books and calls for service, and court adoption of PSR, paragraph 139, supra.

142) Virgilio timely appealed his conviction and new sentence (no. 97-1871), and again, the court rejected the then, new evidence, paragraphs 137-138, granting the government's motion for summary disposition on January 21, 1998, under the previous contentions, paragraph 136, supra.

143) On January 30, 1998, under the same contentions as the one applied to Virgilio, except that the court departed downward due to a head injury that he received, Santo was sentenced to 60 months' incarceration.

144) Santo timely appealed his conviction and new sentence (no. 98-1171), but based on the court summary disposition in Virgilio's, he voluntarily withdrew it to go back along with Virgilio under their habeas corpus. by a motion allowed on April 6, 1998.

L) THE HABEAS CORPUS PROCEEDINGS PUR-
SUANT TO 28 U.S.C. §2255:

145) Santo and Virgilio timely filed their section 2255 motions to vacate the judgments of

convictions on May 4, 1998, and May 14, 1998, under Nos. 98-10775-MLW, and 98-10902-MLW, respectively.

146) Since the government did not respond, on October 16, 1998, and November 2, 1998, Santo and Virgilio, respectively, timely filed amendments to their original petitions.

147) Based on the same contentions, paragraphs 136, 139, supra, on January 20, 1999, the government responded to plaintiffs' Section 2255 motions; Then, plaintiffs timely rebutted, on February 1st, 1999.

148) On January 22, 1999, which was two days after the government response to plaintiffs' motions, upon finishing his term of incarceration, Santo was taken into INS custody, and on August 12, 1999, he was removed to his native Dominican Republic.

149) In or about the summer of 1999, Virgilio produced and served to plaintiffs' brother William, a motion pursuant to Rule 41(e) of the Fed. R. of Civ. Procedure, to claim his brief-case through the court, and to continue a private investigation but his attempts failed, as well as the previous official requests, paragraphs E) 64-69; F) 70-76.

150) Upon receiving the BPD report ("newly

- 68 -

Discovered Evidence") of the gov leak, para-
graph F )76, supra, Virgilio pursued to find
legal representation to finish the case.

## 1) VIRGILIO'S DUE DILIGENCE IN SEE-KING LEGAL REPRESENTATION.

151) On August 21, 2000, Virgilio re-
quested legal assistance to Mr. Nate Hathorne-
Justice Fund Trust Foundation, which was
not active due to lack of funds, in massachusetts.

152) On September 26, 2000, Virgilio reques-
ted legal assistance to the Innocent Project-
Mr. Barry Scheck at the Benjamin N. Cardoso
school of law, in new york.

153) On September 27, october 2, and Novem-
ber 1st, 2000, Virgilio contacted Mr. Rubin "Hu-
rracaine" Carter Defense for the wrongly con-
victed, in Ontario, Canada, for legal assistance.

154) On October 4, 2000, the Innocent Pro-
ject responded indicating that they would get
involved in the case, but that plaintiffs had
to be placed in a waiting list for at least
six months, paragraph 152, supra.

155) Since Virgilio did not want to spend
six months waiting, on october 12, 2000, he re-
quested legal assistance to the "committee to
Free the Innocent," in Washington; but this

was returned for change of address, on
October 27, 2000.

156) On October 24, 2000, Virgilio spoke to
his Couselor, Mr. Harding, who advised him
to talk to the lawyer of the institution - FMC
Devens, to seek a lawyer from the court,
and the person he spoke to told him that
they did not do that.

157) On November 27, 2000, Virgilio filed the
motion to expond the record for plaintiffs' ori-
ginal petitions for habeos Corpus, with the "New-
ly Discovered Evidence in the U.S. District Court.

158) On December 6, 2000, Virgilio requested
the interposition of the American Civil Liber-
ties Union ("ACLU") in Boston, which responded
on January 5, 2001, indicating that they were
only taking cases of long sentences.

158) On December 21, 2000, Virgilio received
the response by the NYCLU, indicating that they
were not taking individual cases, but those
involving issues of a class.

159) On January 11, 2001, Virgilio received
response to his request to Mr. Rubun Hurra-
caine" Carter, paragraph 153, supra, indica-
ting that they take only cases of murders; but
recommended him to contact Professor Doug
Colbert, in California, paragraph 160, infra.

-70-

160) On January 12, 2001, Virgilio talked to Professor Doug Colbert, who told him that they had so many cases and thus, they were not taking any, at the moment, paragraph 159, supra.

161) On January 29, 2001, Virgilio requested legal assistance to the Federal Public Defenders' office, in Boston, which responded on February 23, 2001, indicating that they were overcrowded and were not taking more cases.

162) On March 23, 2001, Virgilio received the response by "Amnesty International," indicating that they were not taking national cases.

163) On April 13, 2001, Virgilio submitted a -69 page "petitioners' memoranda of law" to the court; a "writ of mandamus" to the court of Appeals; and copies to the diplomatic and religious channels, all with the indication of his hunger strike as a protest to his continued injustice, paragraph 164, infra.

164) On April 15, 2001, Virgilio submitted himself to a hunger strike, which he lifted up on May 2, 2001, in MDC Brooklyn, New York.

165) On June 1, 2001, the court allowed plaintiffs' jointly motion to expand the record indicating that "it was not opposed," paragraph 157, supra.

166) On June 18, 2001, the government responded indicating that the BPD report was not disclosed in Discovery, but that the government had no obligation to produce the report because "it was not then in the government's possession."

167) On June 25, 2001, the court ordered the government to supplement its response; and also, ordered plaintiffs to inform the court if they wished to request the appointment of Counsel.

168) On July 18, 2001, the court allowed plaintiffs' motions, appointing John F. Palmer to represent Santo, and Melvin Norris for Virgilio, on August 9, 2001.

169) On July 27, 2001, upon finishing his incarceration time, Virgilio was taken into INS custody.

2) THE TRANSFER FROM THE BOP TO THE INS and custody of legal and personal properties.

170) Upon the INS transfer from MDC Brooklyn, to the Varick Street Center, New York, on July 30, 2001, Virgilio provided the BOP and INS, his sister in-law, Mrs. Rosa Ruiz' address, as they requested to mail his about six boxes of legal and personal properties.

-72-

171) On July 30, 2001, Virgilio resumed his hunger strike as a protest for his continued incarceration, and lifted it off on August 9, 2001.

172) On or about August 18, 2001, upon the granting of Virgilio's motion to change of venue and court order, he was brought to the Boston INS Processing Center, and then, to the Adult Correctional Institution ("ACI"), in Cranston, Rhode Island.

173) On August 28, 2001, a conference was held to schedule further briefing and a release on bond was addressed but remained pending.

174) On October 25, 2001, Virgilio resumed his hunger strike in protest for his continued incarceration, and needing to work in his case.

175) On October 27, 2001, Virgilio was assaulted by officers at ACI, paragraph 176, infra.

176) On October 29, 2001, after a crisis of a "panick attack," and inspection of his injuries, the INS District Chief Director, Mr. Creeck ordered Virgilio transfer to Bristol County Jail ("BCJ"), in North Dartmouth, MA; compromising to an investigation, Virgilio's physical evaluation, and bring his legal and personal properties from ACI to BCJ.

-73-

177) On November 6, 2001, at about 9:00 a.m., Virgilio was interviewed by the INS officer in charge of the investigation of the assault, paragraphs 175-176, supra.

178) On November 9, 2001, Counselor Manuel Tonares, at BCJ, informed that ACI had thrown away his properties.

179) From November 1st to November 9, 2001, in BCJ; and from this date to the present, in PCCF, treatments to Virgilio have been performed as to the following diagnostics, but not limited to, as a result of the assault, to wit, infection in the bladder; a-broken-left-hand thumb bone; a grown upper-back benign tumor; etc.

180) On December 10, 2001, an INS Judge ordered Virgilio deported, based his conviction.

181) On May 3, 2002, the Board of Immigration (of) Appeals ("BIA"), affirmed, upon his deportation appeal, paragraph 180, supra.

182) On March 14, 2002, the court held a non-evidentiary hearing where Plaintiffs' motions were construed.

182) On June 20, 2002, the court issued a memorandum and order denying Plaintiffs' jointly motion, paragraph 157, supra, and the petitions "with regard to the ultimate relief

-74-

requested, a new trial."

183) After the granting certificate of appealability, the pending appeals were consolidated under Nos. 02-1892 and 02-1893, for Santo and Virgilio, respectively.

184) On November 27, 2002, the BOP, informed Virgilio that INS in New York received his property on August 20, 2001, Paragraph L)(2) 170, supra.

185) After attempts through INS, on February 7, 2003, agent McMiss in Boston informed Virgilio that INS did not have his property.

186) On February 13, 2003, the Court stayed Virgilio's deportation pending the resolution of the appeals.

## M) THE COLLATERAL CONSEQUENCES AS A RESULT OF THE FOREGOING MATTER.

### 1) AS TO SANTO RUIZ

187) As a result of this matter, Santo, Rosa and three children, along with the rest of their family, to wit, parents, brothers, sisters, etc., suffered emotional and economical hardship as follows, but not limited to, for

A) Separation and loss of freedom during his 319 days in home confinement, to wit, from August 7, 1993 to June 21, 1994; and 1881 days

institutionalized, to wit, from August 2, 1993, to August 6, 1993; and from June 22, 1994, to August 12, 1999, paragraphs K)(1) 123-133, Supra.

B) Separation as a result of deportation, to wit, from August 12, 1999 to the date that he would be brought back in the future;

C) The emotional and physical continuing damages that resulted from his accident in FCI-Ray Brook, paragraph K)(1) 134, Supra;

D) The tangible value of the premise and the investment in the store of forty eight thousand dollars ($48,000), plus the intangible value, to wit, the future benefits that would have produced from December 16, 1990, until the date of the upcoming judgment of redress in this matter;

E) The amount of ——————————————— as legal expenses incurred in the whole matter; ETC.

2) AS TO VIRGILIO RUIZ

188) As a result of this matter, Virgilio, Jane Doe (fiancee), along with the rest of their family, to wit, parents, brothers, sisters, etc., suffered emotional and economical hardship as follows, but not limited to, for

A) Separation and loss of freedom during his 321 days in conditional freedom-release, to wit;

-76-

from August 5, 1993, to June 21, 1994; and 3288 days institutionalized, to wit, but not limited to, from August 2, 1993, to August 4, 1993; and from June 22, 1994, to June 22, 2003; and any continued period, from this date to the date of redress or release, paragraphs K)(1) 123-133, supra;

B) The prevention from having his own family;

C) The prevention from finishing and having his professional career, which at the time of his conviction, was at the pregraduation stage in college;

D) The emotional and physical permanent damage that resulted from his injuries, the night of the fire, paragraphs G) 80-88, supra.

E) The emotional and physical permanent damage that resulted from his injuries, as a result of the assault against him, paragraphs L)(2) 175-179, supra;

F) The economical hardship-loss of income as a concept of losing contracted and self-employment salaries;

G) The amount of _____, as legal expenses incurred in the whole matter; ETC.

**N)** <u>REQUESTED RELIEF</u>

189) WHEREFORE, for the DEMONSTRA-TED deliberate and wanton false investigation and false arrests; malicious prosecution, and wrong conviction, punishment and collateral consequen-ces, plaintiffs respectfully demands from this court a compensatory and punitive judgment against defendants, as follows, but not limited to, of

A) Seventy million dollars ($70 million) for Santo Ruiz; and one hundred million dollars ($100 million) for Virgilio Ruiz, or an amount con-sidered to be just by

B) A fair jury trial; where

C) An injunction be issued to subject the defendants to be committed or to guarantee plaintiffs' redress in this action, without any retribution, under any circumstances; and

D) Any other relief as this court may deem Just and Proper

Respectfully Submitted

Date: JUNE 23, 2003.

Santo Ruiz
P.O. BOX 1361
JAMAICA PLAIN, MA 02130

Virgilio Ruiz
26 LONG POND ROAD
PLYMOUTH, MA 02360

-78-

CERTIFICATE OF AUTHENTICATION
I know that the foregoing infor-
mation will be used in a court of law, and
thus, the facts herein are stated under pe-
nalty of perjury as in an affidavit, in fact
this complaint will be supported by upcoming
affidavits, as truthful to the best of my
knowledge and belief pursuant to 28 USC
§ 1746; 18 USC § 1001.

DATE: JUNE 23, 2003.    Virgilio Ruiz